16 U.S. 37 (____)
3 Wheat. 37
The STAR: DICKENSON et al., Claimants.
Supreme Court of United States.

February 11th. Key, for the appellants and claimants.
Winder and Harper, contrà.
*38 *40 February 16th, 1818. STORY, Justice, delivered the opinion of the court.
This is the case of an American ship, captured by the enemy, during the late war, and after condemnation and sale to an enemy merchant, re-captured by the American private armed ship Surprise. And the question is, whether, *86] under these circumstances, *the ship is to be restored, on salvage, to the former American owner, or condemned as good prize of war? If the case were to stand on the general salvage act of 1800, in cases of re-capture (act of 3d of March 1800, ch. 14), it is perfectly clear, that the claimants are barred of all right; for that act expressly excepts from its operation, all cases where the property has been condemned by competent authority. The same result would flow from the principles of the law of nations. It is admitted, on all sides, by public jurists, that in cases of capture, a firm possession changes the title to the property; and although there has been, in former times, much vexed discussion as to the time at which this change of property takes place, whether on the capture, or on the pernoctation, or on the carrying infra prsidia, of the prize; it is universally allowed, that at all events, a sentence of condemnation completely extinguishes the title of the original proprietor, and transfers a rightful title to the captors or their sovereign. It would follow, of course, that property re-captured from an enemy, after condemnation, would, by the law of nations, be lawful prize of war, in whomsoever the antecedent title might have vested.
It is supposed, however, that the provisions of the salvage act of 1800, ch. 14, are materially changed, in cases of captures by private armed ships, by the fifth section of the prize act of the 26th of June 1812, ch. 107. That section declares, "that all vessels, goods and effects, the property of any citizen of the United States, or of persons resident within and under the protection of *87] the United States, or of persons *permanently resident within, and under the protection of any foreign prince, government or state, in amity with the United States, which shall have been captured by the enemy, and which shall be re-captured by vessels commissioned as aforesaid, shall be restored to the lawful owners, upon payment by them, respectively, of a just and reasonable salvage, to be determined by the mutual agreement of the parties concerned, or by the decree of any court of competent jurisdiction, according to the nature of each case, agreeably to the provisions heretofore established by law." The argument is, that as the section directs all vessels, goods and effects of citizens and neutrals, re-captured from the enemy, to be restored, without any reference of the fact, whether they had been previously condemned or not, it so far qualifies and repeals the salvage act of 1800; and that, consistently with this construction, the words "agreeably to the *41 provisions heretofore established by law," may and ought to be referred to the rate of salvage fixed by the act of 1800, and not to the provisions of that act generally. In support of this argument, it has been urged, that upon any other construction, the whole section becomes completely inoperative, as every case is embraced in the previous law. That congress may well be presumed to have intended to make a discrimination between cases of re-capture by public and private ships of war, unfavorable to the latter; and that congress may had in view, a conformity to the British prize code, which, since the passing of the act of 1800, had been changed in the manner now contended for by the claimant.
*The argument asserted from the British prize code, certainly, [*88 cannot be supported upon the notion of any supposed recent change in the law relative to re-captures. So early as the reign of George II., the jus postliminii was, by statute, reserved to British subjects, upon all re-captures of their vessels and goods, by British ships, even though a previous condemnation had passed upon them, with the exception of cases where such vessels, after capture, had been set forth as ships of war. The statute of 43 Geo. III., ch. 160, § 39, has no further altered the previous laws, than to fix the salvage at uniform stipulated rates, instead of leaving it to depend upon the length of time the re-captured ship was in the hands of the enemy. And the terms of this statute are very different from the language of the fifth section of our prize act of 1812, and expressly exclude from its operation and benefits all neutral property.
In respect to the legislative intention, it is extremely difficult, to draw any conclusion unfavorable to private armed ships, from the language or policy of the prize act, or any subsequent act of congress passed during the war. The bounties held out to these vessels, not only by the prize act, but by other auxiliary acts, manifest a strong solicitude in the government to encourage this species of force. But we are not at liberty to entertain any discussions in relation to the policy of the government, except so far as that policy is brought judicially to our notice, in the positive enactments, and declared will of the legislature. We must interpret, therefore, this clause of the prize act by the general rules of construction applicable to *all [*89 statutes; and in this view, we are of opinion, that the doctrine contended for by the claimant ought not to prevail.
In the first place, the section in question contains no repealing clause of any of the provisions of the salvage act of 1800, and therefore, the whole laws on this subject are to be construed together, and unless so far as there is any repugnancy between them, are to be considered as in full force. That the section is free from all doubt in its language, need not be asserted; but that every portion of it may, by fair rules of interpretation, be deemed merely affirmative of the existing law, is, with great confidence, maintained. There is no repugnancy which requires or even affords a presumption of legislative intent to repeal any portion of the salvage act. It is true, that the section declares that all vessels, goods and effects re-captured, shall be restored; but to whom are they to be restored? Certainly, by the very terms of the act, to the "lawful owners," which, to prevent the most injurious, and we had almost said absurd, consequences, must mean the "lawful owners," at the time of the re-capture. But the lawful owner of re-captured property, which has been already lawfully condemned, is not the *42 original proprietor, but the person who has succeeded to that title, under the decree of condemnation. Suppose, the property at the time of the capture had belonged to one neutral, and after condemnation, had been sold to another neutral, and then captured and re-captured by the enemy, can there be a doubt, that the latter is, to all intents and purposes, the true and lawful *90] owner, and that he may assert his *title against the first proprietor? Besides, re-capture, by force of the term, would seem most properly applied to cases where an inchoate title only was vested by capture. Can it be said, in strict propriety of language, that property captured from an enemy, which at the time is the lawful property of an enemy purchaser, is re-captured from his hands? The re-capture is always supposed to be from those who are the original captors, not from persons who have, by operation of law, succeeded to the title acquired under a decree of condemnation.
The section, however, does not stop here; nor is it necessary to rest its construction upon the import of a few detached terms. It proceeds to declare, that the re-captured property shall be restored to the lawful owners, upon payment of a reasonable salvage, "according to the nature of each case, agreeably to the provisions heretofore established by law." Here is a direct and palpable reference to the salvage act, not for the purpose of repeal, but for the purpose of recognising it as in full force in respect to all cases of re-capture. It is argued, that the reference is confined to the mere rates of salvage established by that act. Let us see, whether, consistently with any supposed legislative intention, or any reasonable principle, such a construction can be sustained. In the first place, it would make a discrimination between re-captures of property belonging to the United States, and property belonging to neutrals and citizens, wholly unaccountable, upon any principles of national policy. In case of a previous condemnation, the property, if belonging to citizens or neutrals, would be restored on salvage; if *91] belonging *to the United States, it would be wholly condemned as good prize of war. In the next place, the property of neutrals and citizens, if re-captured by public ships, would be good prize; but if re-captured by private armed ships, would be restored on salvage. Yet, in respect to neutrals or citizens, if the intention was to confer a benefit on them, the reason would seem equally to apply to both cases. And if there was a policy in discouraging captures by privateers, and encouraging captures by public ships, it is strange, that the legislature should not, in relation to captures, not within the purview of this clause, have made a similar discrimination. The reason would be the same, and yet, in those cases, the salvage act uniformly gives a higher rate of salvage to private armed ships than to public ships; and the prize acts superadd an exclusive bounty on prisoners of war captured by private armed ships, of no inconsiderable value. And whatever might be the case in relation to our own citizens, it is somewhat singular, that the legislature should be paying bounties out of the treasury, to encourage privateers, when they were in favor of neutrals, having no legal title, taking from them a large proportion of the lawful proceeds of prize.
There is yet another case which affords a more striking illustration of the difficulties which surround this construction. The salvage act of 1800 declares, that upon the re-capture of neutral property, the rule of reciprocity shall prevail. If the neutral would, in the like case, restore on salvage, *43 then the American courts are to restore on the same salvage: if otherwise, then they are to condemn. If, otherwise, by *the prize act of 1812, [*92 restitution is to be made in all cases of re-capture of neutral property, and yet, in the like cases, the neutral sovereign would not restore, it would follow that the restitution would be without payment of any salvage, which would be repugnant not only to the intent, but to the words both of the salvage act and the prize act, in any mode of interpretation. In a recent case in this court (The Adeline, 9 Cranch 244), condemnation passed upon some French property which, during the late war, had been captured by the enemy, and re-captured by an American privateer, upon the ground that the rule of reciprocity established by the salvage act of 1800, applied to the case; and as France would deny restitution, our courts were bound to apply the same principle to her.
There does, not, therefore, seem any solid reason on which to rest the construction contended for by the claimant. And there are the most weighty reasons, founded upon public inconveniency, upon national law. and upon the very terms of the salvage and prize acts, for the contrary construction. In considering the section in question as merely affirmative, every difficulty vanishes, and the symmetry of a system, apparently built up with great care and caution, as well as in strict accordance with the received principles of public law, is maintained and enforced.
But it has been asked, if the section is merely affirmative, what reason can be assigned for its enactment? If no satisfactory answer could be assigned, it would not impair the force of the preceding reasoning. It is very common for the legislature to make laws in affirmance both of the common *and statute law. This very act gives the district court [*93 cognisance of captures, and yet it was clearly settled, that the courts already possessed the same jurisdiction. Doubts may and often do arise, how far a provision already in existence may be applied to cases contemplated in new statutes. To obviate such doubts, whether real or imaginary, is certainly not an irrational or unsatisfactory mode of legislation, and often prevents serious mischiefs, during the fluctuations of professional opinions, prior to a legal adjudication. It was probably to obviate some doubt of this sort, that the clause in question was inserted in the act. Nor is it difficult to perceive some room for subtle doubt from the generality of the preceding (§ 4) section. That section declares that "all captures and prizes of vessels and property shall be forfeited," and accrue to the owners, officers and crew of the capturing private armed ship; and from the generality of this language it might possibly (we do not say, upon any sound interpretation) have been doubted, whether the words "all captures" might not be held to comprehend captures of neutral property, which had not yet been condemned. At all events, upon every view of this case, the court are of opinion, that the property having been previously condemned and title passed to the enemy, and consistently with the salvage and prize acts, must be decreed to be good prize of war.
Decree affirmed, with costs.[(a)]
*44 
*45 
*46 
*47 
NOTES
[(a)] See 2 Wheat. App'x, note I., pp. 40-49. As by the salvage act of the 3d of March 1800, ch. 168, the rule *of reciprocity (or, as Sir WILLIAM SCOTT calls it, amicable retaliation) [*94 is the rule to be applied to cases of re-captures of the property of friendly nations, it may be useful, to state the provisions contained in the different maritime codes on this subject, or which have been substituted in their place by treaty.

The present British law of salvage is established by the act of the 43 Geo. III., ch. 160, the 39th section of which provides, that, "If any ship or vessel, taken as prize, or any goods therein, shall appear, in the court of admiralty, to have belonged to any of his majesty's subjects, which were before taken by any of his majesty's enemies, and at any time afterwards retaken by any of his majesty's ships, or any privateer, or other ship or vessel, under his majesty's protection; such ships, vessels and goods, shall, in all cases (save as hereafter excepted), be adjudged to be restored, and shall be accordingly restored, to such former owner or owners, he or they paying for salvage, if retaken by any of his majesty's ships, one-eighth part of the true value thereof, to the flag-officers, captains, &c., to be divided, &c. And if retaken by any privateer, or other ship or vessel, one-sixth part of the true value of such ships and goods, to be paid to the owners, officers and seamen of such privateer or other vessel, without any deduction. And if retaken by the joint operation of one or more of his majesty's ships, and one or more private ships of war, the judge of the court of admiralty, or other court having cognisance thereof, shall order such salvage, and in such proportions, to be paid to the captors, by the owners, as he shall, under the circumstances of the case, deem fit and reasonable. But, if such re-captured ship, or vessel, shall appear to have been set forth by the enemy as a ship or vessel of war, the said ship or vessel shall not be restored to the former owners; but shall, in all cases, whether retaken by any of his majesty's ships, or by any privateer, be adjudged lawful prize, for the benefit of the captors.
This rule, with respect to the property of British subjects, is applied to re-captures *95] of the property of nations in amity with Great Britain, until *it appears that they act towards British property on a less liberal principle; in such case, it adopts their rule, and restores, at the same rate of salvage, or condemns, under the same circumstances, in which their own law and practice restores or condemns. The Santa Cruz, 1 Rob. 5, 63.
By the most recent French law, if a French vessel be retaken from the enemy, after being in his hands more than twenty-four hours, if re-captured by a privateer, she is good prize to the re-captors; but if retaken before twenty-four hours have elapsed, she is restored to the owner, with the cargo, upon the payment of one-third the value for salvage, in case of re-capture by a privateer, and one-thirtieth in case of a re-capture by a public ship. But in case of re-capture by a public ship, after twenty-four hours possession, she is restored on a salvage of one-tenth.[1]
*Although the letter of the ordinances, previous to the revolution, condemns as good prize, French property re-captured after being twenty-four hours in possession of the enemy, whether the same be retaken by public or private armed vessels; yet it seems to have been the constant practice, in France, to restore such property, when re-captured by the king's ships. Valin, sur l'Ord., liv. 3, tit. 9, Des Prises, art. 3; Traité des Prises, ch. 6, § 1, n. 8, § 88; Pothier, De Propriété, n. 97; Emerigon, Des Assurances, tom. 1, p. 497. The reservation contained in the above ordinance of 1779, made the salvage discretionary, in every case, it being regulated by the king in council, according to the particular circumstances. Emerigon, Ibid.
France applies her own rule to re-captures of the property of friendly nations. Pothier, De Propriété, n. 100; Emerigon, Des Assurances, tom. 1, p. 499. By the Réglement of the 2 Praireal, 11th year, art. 54, this relaxation of the rule as to captures by public ships, is extended to allies, generally, so as to grant them restitution, after twenty-four hours' possession by the enemy, upon the payment of a salvage of one-tenth; but restitution on re-captures by public ships has always been made to the subjects of Spain on account of the intimate relation subsisting between the two powers, whilst it is refused even to them in re-captures by privateers. Azuni, part. 2, ch. 4, § 11; Bonnemant's Translation of De Habreu, tom. 2, p. 83, 84.
The French law also restores, upon payment of salvage, even after twenty-four hours' possession by the enemy, in cases where the enemy leave the prize a derelict, or it reverts to the original proprietor, in consequence of the perils of the seas, without a military re-capture. Ordonnance de 1681, liv. 3, tit. 9, Des Prises, art. 9; See 2 Wheat. app'x, p. 47.
*Spain formerly adopted the law of France, having taken its prize code from [*97 that country, with which it had been so long connected by the closest ties; and in the case of The San Iago (mentioned in The Santa Cruz, 1 Rob. 50), it was applied by the Lords of Appeal, upon the principle of reciprocity, as the rule in British re-captures of Spanish property. But by the Spanish prize ordinance of the 20th of June 1801, art. 38, it was modified, as to the property of friends, it being provided, that when it appears that re-captured ships of friends are not laden for enemy's account, they shall be restored, if re-captured by public vessels, for one-eighth, if by privateers, for one-sixth salvage: provided, that the nation to whom such property belongs, has adopted, or agrees to adopt, a similar conduct towards Spain. The ancient rule is preserved as to re-captures of Spanish property; it being restored, without salvage, if re-captured by a king's ship, before or after twenty-four hours' possession; and if re-captured by a privateer, within the twenty-four hours, upon payment of one-half for salvage; if re-captured after that time, it is condemned to the re-captors. The Spanish law has the same provisions with the French, in cases of captured property becoming derelict, or reverting to the possession of the former owners by civil salvage.
Portugal had adopted the French and Spanish law in her ordinances of 1704, and of December 1796. But in May 1797, after the Santa Cruz was taken, and before the judgment in that case, Portugal revoked her former rule that twenty-four hours' possession divested the property, and allowed restitution, on salvage of one-eighth, if the re-capture was by a public ship, and one-fifth, if by a privateer. In The Santa Cruz, and its fellow cases, Sir W. SCOTT distinguished between re-captures made before and since the ordinance of May 1797; condemning the former, where the property had been twenty-four hours in the enemy's possession, and restoring the latter, upon payment of the salvage fixed by the Portuguese ordinances.
The ancient law of Holland regulated restitution on salvage, at different rates, *98] according to the length of time the property had been in the enemy's *possession. Bynk. Q.J. Pub. lib. 1, ch. 5. But as between the United States and the Netherlands, this matter is regulated by the convention of 1782, the first article of which provides, that re-captured vessels of either nation, not having been twenty-four hours in possession of the enemy of either, shall be restored, on payment of one-third salvage, if re-captured by a privateer. By the 2d article, if the vessel has been twenty-four hours in possession of the enemy, and is re-captured by a privateer, she shall be condemned to the re-captors. By the 3d article, if the re-capture is made by a public ship, the property is to be restored, on payment of a thirtieth part for salvage, in case it has been twenty-fours in possession of the enemy; if longer, a tenth part.
The treaties between the United States and Prussia of 1785 and 1799, by which re-captures from a common enemy were regulated, have both expired.
The ancient law of Denmark condemned, after twenty-four hours' possession by the enemy, and restored, if the property had been a less time in his possession, upon payment of a moiety for salvage. But the ordinance of the 28th of March 1810, restored Danish or allied property, without regard to the length of time it might have been in the enemy's possession, upon payment of one-third for salvage.
By the ancient Swedish ordinances, and that of July 1788, it is provided, that the rates of salvage on Swedish property shall be one-half of the value, without regard to the length of time the property may have been in the enemy's possession. The treaty between the United States and Sweden, of 1783, which has expired, contained precisely the same stipulations on this subject as that with the Netherlands.
Although our salvage act may not, perhaps, extend to cases of re-capture from pirates, yet there can be little doubt, that the benefit of the same equitable rule of reciprocity, which is recognised by the statute, and is also a principle of public law, would be imparted to such cases. Thus, Valin is of the opinion, that the property of friendly nations, retaken from pirates, by French captors, ought not to be restored to *99] them, upon payment of salvage, if the law of their *own country gives it wholly to the retakers, otherwise, there would be a defect of reciprocity, which would offend against that impartial justice which is due from one state to another.[1]
As a capture by pirates cannot divest the title of the original owner, by any length of possession, however great, it is obvious, that the former proprietor is entitled to restitution, in case of re-capture from them by friendly powers, upon the payment of a reasonable salvage. But certain nations have established a different rule, at least, as respects the property of their own subjects, and give the whole property re-captured from pirates to the retakers. Such was, or is the usage of Holland, Spain and some of the Italian States. Grotius, de Jure Belli ac Pacis, lib. 3, ch. 9, § 17; De Habreu, part 2, ch. 6. But Grotius is of the opinion, that such a municipal regulation cannot prevent foreigners from reclaiming their property, upon payment of a reasonable salvage, because, by the universal law of nations, the property of the original owner is not divested on a capture by pirates. Ibid. And by the 9th article of the treaty of 1795 between the United States and Spain, the latter has dispensed with her peculiar law in this respect, both parties having stipulated to restore the property of either nation re-captured from pirates. In case of re-capture from pirates, the French law restores the property of subjects and allies (in which last term, neutrals are included), on payment of one-third for salvage.[2]
A capture by a cruiser of the Barbary powers is not a *piratical seizure which will have the effect of invalidating the conversion of property under it. They were formerly considered as pirates, but have since acquired the rights of legation and of war, in form. Consequently, re-captures from them are to be judged by the same rule as those from any other public enemies. The Helena, 4 Rob. 3; Sir L. Jenkins's Works, Vol. II., p. 791; Bynk. Q.J. Pub., lib. 1, ch. 17; Emerigon, Des Assurances, tom. 1, p. 526.[1] But the law of nations, as received among the nations of Europe and the countries colonized by them, or that portion of the human race denominated Christendom, is not to be applied to them, to the Turks, and other Mohammedan people, with the same rigor, and in all the details, with which it is administered among that class of nations to which it is peculiarly applicable. The Helena, 4 Rob. 3; The Kinders Kinder, 2 Ibid. 88; The Hurtige Hane, 3 Ibid. 324; The Madonna del Burso, 4 Ibid. 169; Ward's History of the Law of Nations. The same formalities in proceeding to condemn captured property, are not required in order to divest the title of the original owner. It is sufficient, if the confiscation takes place in their way, and according to the established custom of that part of the world. The Helena, 4 Rob. 3. But they are held to be bound to an observance of the law of blockade, that being one of the most universal and simple operations of war; and if a European army or fleet is blockading a town or port, they are not at liberty to trade with it. The Hurtige Hane, 3 Rob. 324. And though, in prize causes, an indulgence is granted to the subjects of the Ottoman empire, which is not allowed to any foreigners of Christendom, in consideration of their peculiar situation and character, and of their not being professors of exactly the same law of nations, *with ourselves; yet in matters of contract between such persons, or between [*101 them and other foreigners, courts of justice have not thought themselves at liberty to act otherwise, than by the general rules applicable to all forensic business. The Jerusalem, 2 Gallis. 191-201.
The case of the rescue of captured vessels and cargoes from the enemy, by the insurrection of the persons on board, is not provided for by our salvage act, or the British statute. Nor is the case of rescue mentioned in the French and other continental ordinances. Restitution to the original owner, is, however, universally decreed, in such cases, without regard to the length of time the re-captured property may have been in the enemy's possession; and the rate of salvage is discretionary, and dependant upon the value of the services performed. The Two Friends, 1 Rob. 271; The Walker, Stew. 105; Valin, Traité des Prises, ch. 6, § 1, n. 18; Bonnemant's Translation of De Habreu, tom. 2, p. 84; Emerigon, Des Assurances, tom. 1, p. 505.
[1 "Si aucun navire de nos sujets pris par nos ennemis, a été entre leur mains jusques à vingt-quatre heures, et après, qu'il soit recous et repris par aucuns de nos navires de guerre ou autres de nos sujets, la prise sera déclarée bonne: mais si ladite reprise est faite auparavant les vingt-quatre heures, il sera restitué avec tout ce qui étoit dedans, et en aura toutefois le navire de guerre qui l'aura recous et repris, le tiers." Ordonnance d'Henri III., en Mars 1584, art. 61. "Si aucun navire de nos sujets est repris sur nos ennemis, après qu'il aura demeuré entre leur mains pendant vingt-quatre heures, il sera restitué au propriétaire, avec tout ce qui étoit dedans à la reserve du tiers qui sera donné au navire qui aura fait la recousse." Ordonnance de 1681, liv. 3, tit 9, des Prises, art. 8. "Les règlemens concernant la recousse continueront d'être observés suivant leur forme et teneur; en conséquence, lorsque les navires de ses sujets auront été repris par les corsaires armés en course contre les ennemis de l'état, après voir été vingt-quatre heures en leur mains, ils leur appartiendront en totalité; mais dans le cas où la reprise aura été faite avant les vingt-quatre heures, le droit de recousse ne sera que du tiers de la valeur du navire recous et de sa cargaison. En ce qui concerne les reprises faites par les vaisseaux, frégates ou outres bâtimes de sa majesté, le tiers sera adjugé à son profit pour droit de recousse, si elle est faite dans les vingt-quatre heures; et après lédit délai, la reprise sera adjugée en totalité à sa majesté, sans que les états-majors des dits vaisseaux et frégates puissent y rien prétendre: se reservant sa majesté d'accorder aux équipages, une gratification proportionée à la valeur du bâtiment et de sa cargaison, d'après les connoisements et factures, comme aussi de donner aux états-majors des vaisseaux qui auront faites les reprises, et qui auroient eu soin de se distinguer par des actions de valeur, telles graces ou récompenses que sa majesté avisera bon être, suivant les circonstances." Ordonnance de 15 Juin 1779. "Lorsque les bâtimens Français auront été repris par les vaisseaux de la republique, après avoir été 24 heures au pouvoir de l'ennemi, les bâtimens et leur cargaisons appartiendront en totalité aux équipages preneurs; mais dans le cas où la reprise aura été faite avant les vingt-quatre heures, le droit de recousse ne sera que du tiers de la valeur du navire repris et de sa cargaison." Loi d'Octobre 1793. By the réglement of the 2d of Praireal, year 11, art. 54, the rate of salvage on re-captures by public ships, before twenty-four hours' possession, was fixed at one-thirtieth.]
[1 "Me feroit penser, que les alliés qui aux termes de notre article, ont droit de réclamer leur effets repris sur des pirates par des François, ne doivent s'entendre que de ceux qui suivent la même jurisprudence que nous; autrement, il n'y auroit pa de reciprocité: ce qui blesseroit l'egalité de justice, que les états se doivent les uns aux autres. Sur l'Ordonnance, liv. 3, tit. 9, art. 10; Traité des Prises, ch. 6, § 2, n. 8.]
[2 "Les navires et effets de nos sujets ou alliés repris sur les pirates, et réclamés dans l'an et jour de la déclaration qui en aura été faite en l'amirauté, seront rendus aux propriétaires, en payant le tiers de la valeur du vaisseau, et des marchandises pour frais de recousse. Ordonnance de 1681, liv. 3, tit. 9, Des Prises, art. 10.]
[1 Depuis long-temps, les murs antiques étoient disparues des Bords Africains. Les Barbaresques étoient devenus de vrais pirates. Bugia, ed Algieri, infami, nidi di corsari, dit le Tasse; Jérusalem délivrée, chant. 15, st. 21. Mais aujourdhui ils ne merite plus cette qualification, parce que dans leur guerre, ils se conforment à l'ancien droit des gens. Ce n'est que par représailles que leurs prisonniers deviennent esclaves parmi nous." Emerigon, loc. cit. tom. 1, p. 256.]