FILED

February 23 2016

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 14-0181

DA 14-0181

IN THE SUPREME COURT OF THE STATE OF MONTANA

2016 MT 41

STATE OF MONTANA,

      Plaintiff and Appellee,

   v.

JAMES MORRIS COLBURN,

     Defendant and Appellant.

APPEAL FROM:     District Court of the Twenty-First Judicial District,
In and For the County of Ravalli, Cause No. DC 2013-49
Honorable James A. Haynes, Presiding Judge

COUNSEL OF RECORD:

     For Appellant:

          Jennifer A. Hurley (argued), Assistant Appellate Defender,
          Helena, Montana

     For Appellee:

          Timothy C. Fox, Montana Attorney General, C. Mark Fowler (argued),
          Assistant Attorney General, Helena, Montana

          William E. Fulbright, Ravalli County Attorney, Hamilton, Montana

Argued and Submitted: December 2, 2015

Decided: February 23, 2016

Filed:

_____
Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1     James Colburn appeals from his October 2013 convictions in Ravalli County District Court of the offenses of incest, sexual intercourse without consent and sexual assault. We reverse the convictions and remand for a new trial.

¶2     We consider the following issues:

¶3     Issue 1:  Whether the District Court erred when it disqualified Colburn's expert witness from testifying at trial.

¶4     Issue 2:  Whether the District Court erred in its application of the Rape Shield Law to exclude evidence that Colburn offered at trial.

## BACKGROUND

¶5     In 2013 the State charged Colburn with two counts of incest, § 45-5-507, MCA; one count of sexual intercourse without consent, § 45-5-503, MCA; and two counts of sexual assault, § 45-5-502, MCA, all felonies.  In October 2013 the jury convicted Colburn of all of the charged offenses.  In February 2014 the District Court entered judgment sentencing Colburn to terms of imprisonment on each of the convictions.  Colburn appeals.

## STANDARD OF REVIEW

¶6     We review a district court's rulings on the admission of evidence, including the admission of expert testimony, for abuse of discretion.  *Beehler v. Eastern Radiological Assoc.*, 2012 MT 260, ¶ 17, 367 Mont. 21, 289 P.3d 131.  We review a district court's application of a statute to determine whether the application was correct.  *Beehler*, ¶ 17.

## DISCUSSION

¶7     *Issue 1: Whether the District court erred when it disqualified Colburn's expert witness from testifying at trial.*

¶8     Rule 702 of the Montana Rules of Evidence allows a person qualified by knowledge, skill, experience, training or education to testify "in the form of an opinion or otherwise" if "scientific, technical or other specialized knowledge" will assist the jury to understand the evidence or determine a fact in issue. We have encouraged district courts to "construe liberally the rules of evidence so as to admit all relevant expert testimony," subject to "stringent cross-examination." *State v. Damon*, 2005 MT 218, ¶ 19, 328 Mont. 276, 119 P.3d 1194; *Beehler*, ¶ 23. The District Court determined in this case that expert testimony would be appropriate in assisting the jury to understand issues concerning forensic interview techniques.

¶9     The sexual intercourse without consent and sexual assault charges against Colburn related to incidents between Colburn and a neighbor girl referred to as R.W. Those incidents occurred when she was age eleven. The State called R.W. as a witness at trial. She testified to encounters with Colburn in which he touched her private parts manually and with his penis. The two incest charges related to incidents between Colburn and his own daughter, referred to as C.C., also age eleven. The State called C.C. as a witness at trial. She denied generally that Colburn had done anything wrong to her.

¶10    The State also presented the testimony of Nurse Practitioner Mary Hansen, a clinical supervisor with a children's advocacy and adult sexual assault program at St. Patrick Hospital in Missoula. She has an undergraduate degree in sociology and a

3

master's degree in nursing. She is licensed and certified as a pediatric nurse practitioner. She has attended several courses in sexual assault examiner training for nurses, a course in medical assessments of children, as well as attending several conferences in San Diego on child abuse. She testified that a forensic interview is a "structured conversation" with a child who may have been a victim of a crime. She testified that she has been trained in several different schools of forensic interview techniques, including those offered by the American Prosecutor's Research Institute, by First Witness, and by the American Professional Society on Abuse of Children. She testified that she has "a lot of familiarity with many different models" of forensic interviewing, and that there is no certification program or requirement for forensic examiners. Several times in her testimony she characterized forensic interviewing as both a science and an art that requires "a judgment call [to determine] when you're done."

¶11 Hansen interviewed both girls and testified that she followed "best practices" in her interviews. Hansen described disclosures that R.W. made to her about sexual incidents with Colburn. Hansen testified that in her opinion R.W.'s statements to her were consistent with those of a child who had experienced sexual abuse. Hansen opined that R.W. "provided details that were sexual knowledge that a child may not have *unless they've had the experience of sexual abuse*." (Emphasis added.)

¶12 Hansen also testified about her interview with C.C. during which C.C. described inappropriate touching by her father. The prosecution played a video of Hansen's interview with C.C., which was the major direct evidence to support the incest charges against Colburn.

4

¶13 Prior to trial Colburn disclosed that he intended to call Dr. Donna Zook as an expert in child psychology and forensic interview techniques, to critique the techniques used by Hansen in her interview of C.C. The State interviewed Zook prior to trial.

¶14 At trial, Zook testified that she had a doctorate degree in clinical psychology and that her training included 2000 hours in a pre-doctoral internship dealing with juvenile offenders as well as a 3000-hour post-doctoral experience with the Golden Triangle Community Mental Health Center in Havre, Montana. She is a member of the American College of Forensic Examiners and is included in the National Register of Health Service Providers. She has taught psychology at the University of Great Falls. Zook testified that she has done hundreds of juvenile interviews as part of psychological assessments or evaluations. She has also done over twenty critiques of forensic interviews conducted by others and has testified as an expert forensic psychologist hundreds of times.

¶15 The defense made an offer of proof that Zook would testify that Hansen used leading or suggestive questions when interviewing C.C., and would describe the result of those questions as reflected in C.C.'s interview. The State objected to Zook's qualification to criticize Hansen's interviews with the victims. The District Court became involved in examining Zook as to her qualifications, focusing on her familiarity with an interviewing protocol adopted by the National Institute of Child Health and Human Development (referred to in the record as the "NICHD"). Zook testified that she was familiar with that forensic interviewing protocol, and that while it was only one of several such protocols, it had been developed by using empirical research. She testified that she had not completed a 40-hour course in the protocol offered by the Institute.

¶16 The District Court determined that the area of forensic interviewing techniques was an area that would be appropriate for expert testimony to assist the jury. The District Court further determined that the NICHD interviewing technique was the "gold standard" for forensic interviews of children, and apparently that it was the technique employed by Hansen in her interviews with the victims in this case. Based upon Zook's lack of specific training in the NICHD interviewing protocol, the District Court concluded that she was "not qualified in this area of NICHD criticism." The District Court excluded Zook from testifying as an expert witness.

¶17 While the District Court concentrated on whether Zook had been extensively trained in the NICHD interview protocol, Hansen never mentioned that protocol in her testimony. She did not list it as one of the several interview protocols that she had been trained in, and did not testify that she used the protocol in the interview of either victim in this case. Colburn asserts on appeal that the NICHD interview protocol does not appear anywhere in the record except in the District Court's questioning of Zook's qualifications. The State does not refute this assertion.

¶18 It is clear to this Court that Zook was qualified by both education and experience to provide a critique of Hansen's interviewing technique as it related to leading or suggestive questions and the effect that such questions could have on the results. Significantly, neither side contends that any properly-administered child forensic interview should rely upon results obtained through leading or suggestive questions. The District Court "too narrowly conceived the subject matter" at issue here by constraining it to whether Zook was qualified in the NICHD interview protocols. *Beehler,* ¶ 25. Given

6

the importance of the taped interview following CC's general denial that Colburn had assaulted her, Zook's expert opinion about the interview technique was a significant exclusion. The District Court abused its discretion in excluding Dr. Zook from testifying at trial.

¶19 *Issue 2: Whether the District Court erred in its application of the Rape Shield Law to exclude evidence that Colburn offered at trial.*

¶20 Colburn asserts that his defense to the charges involving R.W. was that the allegations were fabricated. Both before trial and at trial he sought to introduce evidence that R.W. had a motive to fabricate allegations against him, and that there was an alternative source for her knowledge of the details of sexual behavior other than anything he had done. The defense theory was that R.W. used her allegations against Colburn to determine whether her mother would believe her and, if so, to then disclose that her own father had abused her. Similarly, the defense theory was that the source of R.W.'s detailed knowledge of sexual abuse came not from Colburn but from abuse inflicted by her own father.

¶21 The District Court excluded any evidence that R.W. had any sexual encounter with any other person, based upon the Montana Rape Shield Law. That law provides:

> Evidence concerning the sexual conduct of the victim is inadmissible in prosecutions under this part except evidence of the victim's past sexual conduct with the offender or evidence of specific instances of the victim's sexual activity to show the origin of semen, pregnancy or disease that is at issue in the prosecution.

7

Section 45-5-511(2), MCA. The District Court determined that R.W. was absolutely protected by this statute, and that it prohibited introduction of any evidence that she had sexual contact with any other person.[1]

¶22    In 1975, Montana joined most other states by adopting a rape shield law. *See* Ch. 129, L. 1975.[2] Under the Rape Shield Law, "evidence concerning the sexual conduct of the victim" is inadmissible in a criminal prosecution, with very limited exceptions not at issue here.[3] Section 45-5-511(2), MCA. Montana's Rape Shield Law is designed to prevent the trial of the charge against the defendant from becoming a trial of the victim's prior sexual conduct. *State v. Higley*, 190 Mont. 412, 422, 621 P.2d 1043, 1050-51 (1980). Rape shield laws generally protect victims from being exposed at trial to harassing or irrelevant questions concerning their past sexual behavior. *Michigan v. Lucas*, 500 U.S. 145, 146, 111 S. Ct. 1743, 1745 (1991); *State v. Anderson*, 211 Mont. 272, 283, 686 P.2d 193, 199 (1984). The statute reflects a compelling state interest in keeping a rape trial from becoming a trial of the victim. *Anderson*, 211 Mont. at 283, 686 P.2d at 199. Rape shield laws evolved from society's recognition that a rape victim's prior sexual history is irrelevant to issues of consent or the victim's propensity for

---

[1] Although this evidence did not go before the jury, the record reflects that R.W.'s father was charged with five counts of incest and eventually pled guilty to sexual assault.

[2] In 1985, Montana broadened the applicability of its Rape Shield Law to include cases involving all types of sexual crimes. *See* Sec. 3, Ch. 172, L. 1985.

[3] The statutory exceptions are evidence of the victim's past sexual conduct with the offender, or evidence of specific instances of the victim's sexual activity to show the origin of semen, pregnancy, or disease that is at issue in the prosecution.

truthfulness. Tanya Bagne Marcketti, *Rape Shield Laws: Do They Shield the Children?*, 78 Iowa L. Rev. 751, 754-55 (1993).

¶23 Although rape shield legislation originally focused on adult rape victims, most jurisdictions also include child victims of sexual abuse within the protections of their rape shield statutes. The policies underlying the application of rape shield statutes to adult victims apply to child victims, as well: rape shield statutes eliminate the need for victims to defend incidents in their past and minimize the trauma of testifying. Marcketti at 756.

¶24 Conflict can arise between rape shield statutes and a defendant's rights to confront his accuser and to present evidence at trial in defense of the charge against him. A defendant charged with a crime has a right to confront his accusers, arising from the Sixth Amendment to the United States Constitution and Article II, Section 24 of the Montana Constitution. *State v. MacKinnon*, 1998 MT 78, ¶ 33, 288 Mont. 329, 957 P.2d 23. A defendant has a similarly-based right to present evidence in his defense. *State v. Johnson*, 1998 MT 107, ¶ 22, 288 Mont. 513, 958 P.2d 1182.

¶25 Neither the Rape Shield Law nor the defendant's right to confront and present evidence are absolute. *MacKinnon*, ¶ 33; *Johnson*, ¶¶ 22-23. The Rape Shield Law therefore cannot be applied to exclude evidence arbitrarily or mechanistically, *Johnson*, ¶ 21, and it is the trial court's responsibility to strike a balance in each case between the defendant's right to present a defense and a victim's rights under the statute. *State v. Lindberg*, 2008 MT 389, ¶ 53, 347 Mont. 76, 196 P.3d 1252. A court balancing the interests of the defendant with those protected by the Rape Shield Law should require that the defendant's proffered evidence is not merely speculative or unsupported.

9

*Johnson*, ¶ 24; *Lindberg*, ¶ 56. Here, the proffered evidence that R.W. was abused by her father was neither speculative nor unsupported, given that he was convicted on charges stemming from his sexual assaults against his daughter. The court should consider whether the evidence is relevant and probative (Rules 401 and 402, M. R. Evid.); whether the evidence is merely cumulative of other admissible evidence; and whether the probative value of the evidence is outweighed by its prejudicial effect (Rule 403, M. R. Evid.). *Commonwealth v. Fernsler*, 715 A.2d 435, 440 (Pa. Sup. Ct. 1998). The purpose of these considerations is to ensure a fair trial for the defendant while upholding the compelling interest of the Rape Shield Law in preserving the integrity of the trial and keeping it from becoming a trial of the victim. *Anderson*, 211 Mont. at 283, 686 P.2d at 199.

¶26 Colburn contends that the District Court's application of the Rape Shield Law in this case frustrated his ability to respond to two crucial pieces of evidence against him: R.W.'s statement that Colburn sexually abused her, and Hansen's testimony that R.W.'s knowledge of sexual activity likely came from her having experienced sexual abuse. Colburn proposed to introduce evidence that R.W., following the allegation that he had abused her, alleged that she had been abused by her own father. He also proposed to introduce evidence that R.W. said that she determined that she could make the allegations about her father because her allegations about Colburn had been taken seriously, thus tying her disclosure in the two cases together. In addition, Colburn contended that evidence that R.W. had been abused by her own father was crucial to counter or at least

10

contextualize the testimony of Hansen that R.W.'s detailed knowledge of sexual activities must have arisen from her being sexually abused.

¶27 Colburn's defense to the charges involving R.W. depended upon undermining the credibility of her account that he abused her. It substantially depended upon undermining Hansen's endorsement of the credibility of R.W.'s account of Colburn's acts of abuse.[4] Thus, from Colburn's point of view, the proposed evidence was an essential part of his important right to confront the witnesses against him and to mount a meaningful defense to the charges.[5]

¶28 At the same time, the Montana Rape Shield Law has long been construed to not automatically exclude evidence that "can be narrowed to the issue of the complaining witness' veracity." *Anderson*, 211 Mont. at 284, 686 P.2d at 200.[6] The district court has the power and responsibility to manage the defense evidence to prevent "sordid probes into a victim's past sexual conduct." *Anderson*, 211 Mont. at 284, 686 P.2d at 200. In *Lindberg,* for example, the district court allowed the defendant in a sexual abuse case to

---

[4] *State v. Stuit*, 268 Mont. 176, 885 P.2d 1290 (1994), is not dispositive of the present case. There the defendant argued that he should have been allowed to present evidence of prior sexual encounters involving the victim because the prosecution "opened the door" in its opening statement. This Court affirmed the District Court's ruling excluding the evidence because the defendant failed to make a contemporaneous objection.

[5] Colburn's ability to counter Hansen's endorsement of R.W.'s credibility was also substantially hampered by the District Court's exclusion of the proposed testimony of Zook.

[6] The State cites *State v. Van Pelt*, 247 Mont. 99, 805 P.2d 549 (1991), for the proposition that attacking the credibility of a witness is insufficient reason for admitting evidence that may be covered by the Rape Shield Law. However, this Court held that the conduct involved in the prior abuse could not be the source of knowledge of sexual activity involved in the case, and later cases, including *Anderson* and *Johnson*, hold that an attack upon the complaining witnesses' veracity does not per se run afoul of the Rape Shield Law.

11

present evidence that his objection to the victim's relationship with another person provided motivation to fabricate charges of abuse to remove the defendant from the household. However, the defendant was not allowed to present evidence concerning the sexual nature of that relationship.

¶29 Such restrictions represent the balancing of the interests involved without wholly sacrificing the interests of the defense or the victim. In the present case the District Court's statements excluding Colburn's proffered evidence show no weighing of his rights to present a defense with the interests represented by the Rape Shield Law. The District Court abused its discretion by mechanistically applying the Rape Shield Law to exclude Colburn's proffered evidence.

¶30 After careful consideration of the record and the parties' arguments and authorities, we reverse the convictions and remand to the District Court for a new trial.


/S/ MIKE McGRATH


We Concur:

/S/ MICHAEL E WHEAT
/S/ PATRICIA COTTER
/S/ BETH BAKER
/S/ JAMES JEREMIAH SHEA
/S/ JIM RICE


Justice Laurie McKinnon, concurring.

¶31 I agree with the ultimate resolution reached by the Court regarding Issue 2, but I offer the following analysis to help guide litigants and trial courts in applying the statute.

12

¶32 To begin, some understanding of the facts is necessary. Colburn was charged with two counts of incest involving his minor daughter, C.C. Colburn was also charged with two counts of felony sexual assault and one count of sexual intercourse without consent involving C.C.'s friend, R.W. At the time of the offenses, both girls were age 11.

¶33 R.W. testified at trial that she and her friend, C.C., used to live in the same apartment building. While visiting C.C., R.W. described how C.C.'s father, Colburn, touched her "top area" and "private part" while she was in Colburn's living room and, on another occasion, in Colburn's bedroom. R.W. also described other occasions when Colburn used his "boy part" to touch the outside of her "private part" and used his mouth on her private part more than once.

¶34 C.C. testified at trial that she and her father would play a game in which she jumped and Colburn would catch her. Colburn's hand touched her private area. Another time, C.C. testified to Colburn's hugging her and that Colburn had one hand on her breast. Colburn also touched C.C.'s bottom underneath her nightgown when she was going to bed. C.C. said she saw the keywords "father-daughter sex" on Colburn's laptop.

¶35 Mary Pat Hansen is a nurse practitioner and clinical supervisor at First STEP Resource Center at St. Patrick's Hospital in Missoula. The Center is a children's advocacy center and an adult sexual assault center. Hansen testified at trial that R.W. made several disclosures of sexual abuse by Colburn and stated that, in her opinion, the statements made by R.W. were consistent with a child who has experienced sexual abuse. Hansen related specific examples to the jury of R.W.'s sexual knowledge that a "child may not have unless they've had an experience of sexual abuse" which included talking

13

"about his genitals or penis being floppy and hard" and "weird, gross noises that she could hear coming from him while certain acts were going on." Hansen's video interview was admitted at trial and played to the jury.

¶36 Hansen also conducted an interview of C.C. C.C.'s trial testimony was consistent with her statements in her interview with Hansen. C.C. also told Hansen that her father told her not to tell anyone about the touching because he would get in trouble. C.C. related to Hansen that her father apologized and that the apologies seemed "sarcastic." Hansen's video interview of C.C. was admitted and played to the jury.

¶37 Colburn filed a motion in limine asking the District Court to allow him to introduce evidence of R.W.'s motive to fabricate and to offer evidence of an alternative source of R.W.'s sexual knowledge. More specifically, Colburn sought to introduce evidence that within one month after disclosing against Colburn, R.W. disclosed abuse by her father. Dr. Catherine Otway conducted a forensic interview of R.W. on March 28, 2013—only several weeks after Hansen's interview—and reported "she [R.W.] just recently felt comfortable disclosing this information because her mom 'believed' her about the sexual abuse by the neighbor, James Colburn." As a result of R.W.'s subsequent disclosures regarding her father, R.W.'s father was charged with five counts of incest and pleaded guilty to sexual assault. Although R.W. told Hansen in the earlier interview that Colburn was the only person to have ever touched her inappropriately and that she trusted her dad; in fact, R.W. had been abused by her father over a period of several years. Colburn argued that R.W.'s disclosures about Colburn during her earlier interview with Hansen were "testing the waters" to learn her mother's reaction before

14

being safe to make a more dramatic disclosure regarding her father. Additionally, Colburn sought to introduce evidence of sexual abuse by R.W.'s father as an alternative source of R.W.'s sexual knowledge. The District Court excluded the evidence, concluding that Montana's rape shield statute prevented admission of the evidence.

¶38 A trial court normally has discretion regarding questions of admissibility of evidence at trial, and we review the court's evidentiary rulings for abuse of that discretion. *State v. Patterson*, 2012 MT 282, ¶ 10, 367 Mont. 186, 291 P.3d 556; *State v. Stock*, 2011 MT 131, ¶ 17, 361 Mont. 1, 256 P.3d 899. However, "in exercising its discretion, the trial court is bound by the Rules of Evidence or applicable statutes, and to the extent that the court's ruling is based on an interpretation of an evidentiary ruling or statute, our review is de novo. Moreover, where the court's conclusions of law involve the Constitution or the rules of evidence, our review is, likewise, de novo." *Patterson*, ¶ 10; *State v. Derbyshire*, 2009 MT 27, ¶ 19, 349 Mont. 114, 201 P.3d 811. Here, Colburn raises a constitutional claim—that his right to a fair trial was violated by the trial court's application of Montana's rape shield statute. Since the District Court's interpretation and application of this statute implicate Colburn's state and federal constitutional rights to a fair trial, we review the court's ruling de novo.

¶39 "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S. Ct. 2142, 2146 (1986) (quoting *Cal. v. Trombetta*, 467 U.S. 479, 485, 104 S. Ct. 2528, 2532

15

(1984)) (internal citations omitted).  This includes "the right to put before a jury evidence that might influence the determination of guilt."  *Taylor v. Illinois*, 484 U.S. 400, 408, 108 S. Ct. 646, 652 (1988).  "We break no new ground in observing that an essential component of procedural fairness is an opportunity to be heard."  *Crane*, 476 U.S. at 690, 106 S. Ct. at 2147 (citing *In re Oliver,* 333 U.S. 257, 273, 68 S. Ct. 499, 507 (1948); *Grannis v. Ordean*, 234 U.S. 385, 394, 34 S. Ct. 779, 783 (1914)).  "That opportunity would be an empty one if the State were permitted to exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence.  In the absence of any valid state justification, exclusion of this kind of exculpatory evidence deprives a defendant of the basic right to have the prosecutor's case encounter and 'survive the crucible of meaningful adversarial testing.'"  *Crane*, 476 U.S. at 691, 106 S. Ct. at 2147 (quoting *United States v. Cronic*, 466 U.S. 648, 656, 104 S. Ct. 2039, 2045 (1984)).

¶40    "[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials."  *United States v. Scheffer*, 523 U.S. 303, 308, 118 S. Ct. 1261, 1264 (1998); *see also Crane*, 476 U.S. at 689-90, 106 S. Ct. at 2146; *Marshall v. Lonberger*, 459 U.S. 422, 438, n.6, 103 S. Ct. 843 (1983); *Chambers*, 410 U.S. at 302-03, 93 S. Ct. at 1049; *Spencer v. Texas*, 385 U.S. 554, 564, 87 S. Ct. 648, 654 (1967).  In *Michigan v. Lucas*, 500 U.S. 145, 111 S. Ct. 1743 (1991), the Supreme Court recognized that the Sixth Amendment right to present relevant evidence "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process."  *Lucas*, 500 U.S. at 149, 111 S. Ct. at 1746 (quoting *Rock v. Arkansas*, 483

U.S. 44, 55, 107 S. Ct. 2704, 2711 (1987)). However, when a state rule of evidence conflicts with the right of the accused to present witnesses, the "rule may not be applied mechanistically to defeat the ends of justice," but must meet the fundamental standards of due process. *Chambers*, 410 U.S. at 302, 93 S. Ct. at 1049.

¶41 For example, in *Chambers*, the defendant was charged with the murder of a police officer. Chambers called a witness who had previously confessed to the murder. *Chambers*, 410 U.S. at 289, 93 S. Ct. at 1043. When the witness repudiated the confession on the stand, the defendant was denied permission to examine him as an adverse witness based on the State's "voucher rule," which barred parties from impeaching their own witnesses. *Chambers*, 410 U.S. at 294, 93 S. Ct. at 1045. In addition, the state hearsay rule did not include an exception for statements against penal interest, and the defendant was therefore not permitted to introduce evidence that the witness had made self-incriminating statements to three other persons. Noting that the State had not even attempted to "defend" or "explain [the] underlying rationale" of the "voucher rule," *Chambers*, 410 U.S. at 297, 93 S. Ct. at 1047, the Supreme Court held that "the exclusion of [the evidence of the witness's out-of-court statements], coupled with the State's refusal to permit [the defendant] to cross-examine [the witness], denied [the defendant] a trial in accord with traditional and fundamental standards of due process." *Chambers*, 410 U.S. at 302, 93 S. Ct. at 1049.

¶42 That a statute operates to prevent a criminal defendant from presenting an entire defense does not necessarily render it unconstitutional. Rules excluding evidence from criminal trials do not abridge an accused's right to present a defense so long as they are

17

not arbitrary or disproportionate to the purposes they are designed to serve. *State v. Johnson*, 1998 MT 107, ¶ 22, 288 Mont. 513, 958 P.2d 1182 (citing *United States v. Scheffer*, 523 U.S. 303, 307-08, 118 S. Ct. 1261, 1264 (1998)). Thus, trial judges retain wide latitude to limit reasonably a criminal defendant's right to cross-examine a witness "based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S. Ct. 1431, 1435 (1986). Courts are required, on a case-by-case basis, to balance the interests of an evidentiary rule excluding evidence with the defendant's constitutional right to present a defense. *Lindberg*, ¶ 56; *Lajoie v. Thompson*, 217 F.3d 663, 669 (9th Cir. 2000).

¶43 Montana's rape shield statute, contained at § 45-5-511 (2), MCA, precludes "evidence concerning the sexual conduct of the victim." The statute provides two narrowly-drawn exceptions: (1) evidence of past sexual conduct with the defendant, and (2) evidence of specific instances of the victim's sexual activity to show the origin of semen, pregnancy, or disease that is at issue in the prosecution. Neither exception is at issue here. We have consistently recognized that the statutory prohibition of certain evidence in § 45-5-511, MCA, "reflects a compelling interest in favor of preserving the integrity of the trial and preventing it from becoming a trial of the victim." *Anderson*, 211 Mont. at 283, 686 P.2d at 199 (brackets, ellipsis, and citation omitted). *See also Johnson*, ¶ 23; *State v. Van Pelt*, 247 Mont. 99, 805 P.2d 549 (1991); *State v. Higley*, 190 Mont. 412, 621 P.2d 1043 (1980). Therefore, to avoid an arbitrary and mechanical operation of the statute which would render it unconstitutional, a defendant's right to

present his defense must be balanced against the interest in preserving the integrity of the trial and preventing it from becoming a trial of the victim.

¶44 This Court has previously recognized that the bar imposed by Montana's rape shield statute is not absolute. *Johnson*, ¶ 23. For example, "evidence of prior false accusations of the same sexual crime involved in a more current case, while not admissible for the purpose of impeaching the *general character or reputation* of the witness, may be admissible if probative of the witness' state of mind, motive, or biases with respect to making the more current accusations." *Anderson*, 211 Mont. at 283, 686 P.2d at 199 (emphasis supplied). Evidence of alleged prior sexual acts of a victim which tend to impugn the victim's reputation or character "is precisely the type of testimony that the rape shield law was designed to prohibit." *State ex rel. Mazurek v. District Court*, 277 Mont. 349, 355, 922 P.2d 474, 478 (1996). However, the policy of protecting against the trial becoming a trial of the victim "is not violated or circumvented if the offered evidence can be narrowed to the issue of the complaining witness' veracity." *Anderson*, 211 Mont. at 284, 686 P.2d at 200. Accordingly, where the evidence is offered to demonstrate a prior false accusation, we have set forth a procedure for the trial court to employ in determining whether to admit the evidence. *See Mazurek*, 277 Mont. at 358, 922 P.2d at 479.

¶45 Inadmissible evidence under the rape shield statute is evidence of the victim's sexual conduct offered for the purpose of impugning the victim's reputation or character and, as a result, rendering the trial a trial of the victim. *Mazurek*, 277 Mont. at 355, 922 P.2d at 478; *State v. Higley*, 190 Mont. 412, 621 P.2d 1043, 1050 (1980). It is difficult to

19

imagine a factual situation where evidence would ever be relevant to an issue in the case which had as its only purpose the impugning the victim's reputation or character. However, sexual conduct evidence which is otherwise inadmissible because it is reputation or character evidence of the victim may still be relevant and probative based upon an alternative theory of admissibility. Thus, we have recognized—in addition to veracity—that evidence of the victim's sexual conduct may be admissible in rape shield cases when it is relevant and "probative of the witness' state of mind, motive, or biases with respect to making the more current accusations." *Anderson*, 211 Mont. at 283, 686 P.2d at 199.

¶46 Where the sexual conduct evidence is sought to be admitted under a permissible basis for admission, the trial judge must balance the probative value of the evidence, as it relates to the defendant's presentation of his defense, against the interest in preventing prejudice to the victim and preserving the integrity of the trial, i.e., ensuring that the trial does not become a trial of the victim. The first step of the inquiry focuses on identifying the permissible basis for admission; the second step requires the trial court to balance the probative value of the evidence against the interest in protecting the integrity of the trial. "The constitution does not require a blanket exception to rape shield statutes for all evidence related to motive to fabricate. Speculative or unsupported allegations are insufficient to tip the scales in favor of a defendant's right to present a defense and against the victim's rights under the rape shield statute." *Johnson*, ¶ 24.

¶47 Finally, the State's reliance on *Van Pelt* is misplaced. Van Pelt argued that the victim could not have consented to any sexual acts because of her young age and that

20

raising prior acts of abuse would not violate § 45-5-511, MCA. *Van Pelt*, 247 Mont. at 100, 805 P.2d at 550. This Court found, based on the evidence presented, that the prior sexual abuse was not relevant to the issue of whether Van Pelt sexually molested the victim because the knowledge the victim exhibited at trial could not have been gained from the type of prior abuse the victim had endured. *Van Pelt*, 247 Mont. at 104, 805 P.2d at 552. Indeed, we recognized in *Van Pelt* that § 45-5-511, MCA, does not provide an "impenetrable wall" of protection for the victim and that the Montana Rules of Evidence certainly allow the credibility of the victim to be attacked. *Van Pelt*, 247 Mont. at 103, 805 P.2d at 552. The State's reliance on *State v. Stuit*, 268 Mont. 176, 885 P.2d 1290 (1994), is similarly misplaced. The issue in Stuit was whether the State had opened the door to sexual abuse evidence during its opening statement and whether Stuit timely objected. *Stuit*, 268 Mont. at 177, 885 P.2d at 1291. We concluded that the court properly ruled that the prosecutor's comment did not open the door to testimony regarding the victim's prior sexual abuse. *Stuit*, 268 Mont. at 184, 885 P.2d at 1296.

¶48 Colburn contends that his inability to present evidence that the victim was "testing the waters" when she disclosed Colburn's acts to a forensic interviewer impaired his ability to present an entire defense and to bring out all facts relevant to the issue of the child's motive to fabricate. The result, Colburn argues, was a partial presentation of the relevant facts to the jury. In contrast, the State presented to the jury a picture of a young victim who made sexually knowledgeable and explicit allegations against her neighbor, with no apparent reason whatsoever to fabricate, supported by a professional's undisputed assessment that the child was credible because she had sexual abuse-based

21

sexual knowledge. Colburn maintains that the State chose to make R.W.'s sexual knowledge a pivotal issue at trial—the kind that only comes from an experience of sexual abuse—to support the inference that Colburn must have been the source of that sexual knowledge. Colburn maintains that the evidence that R.W. was sexually abused by her father could have rebutted that powerful inference. Colburn also maintains that evidence presented through Dr. Catherine Otway that R.W. disclosed against her father because she "only recently felt comfortable disclosing this information because her mom 'believed' her about the sexual abuse by the neighbor, James Colburn" was highly probative of R.W.'s motive to fabricate.

¶49 I agree, after examining the particular facts and the excluded evidence, that evidence related to R.W. testing the waters was relevant to her motive to fabricate. Preventing Colburn from presenting this evidence to the jury violated his constitutional right to present an entire defense. The ability to explore a witness's biases, prejudices, and motives to fabricate enjoys particular constitutional protection because of its critical role in a defense. *Olden v. Kentucky*, 488 U.S. 227, 231-32, 109 S. Ct. 480, 482 (1988); *Davis v. Alaska*, 415 U.S. 308, 317-20, 94 S. Ct. 1105, 1110-12 (1974).

¶50 Furthermore, evidence that R.W. had been a victim of sexual abuse of her father was relevant to show that R.W. could have learned about the sexual acts and male genitalia other than through sexual abuse by Colburn. The jury did not hear of situations from which R.W. could have gained sexual knowledge as a result of the undisputed abuse she suffered at the hands of her father. The State relied heavily on R.W.'s sexualization in the presentation of its case, supported by Hansen's assessment of R.W.'s credibility

22

based on her sexual abuse knowledge. Colburn was unable to rebut this powerful inference that he was the only cause of R.W.'s sexualization.

¶51 For these reasons, and pursuant to this analysis, I would conclude that the District Court incorrectly applied the law when it failed to balance Colburn's constitutional right to present a defense against the interests of the rape shield statute. I join the Court's opinion regarding Issue 1.


/S/ LAURIE McKINNON